IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MISSION BANK, | CASE NO. CV F 12-1663 LJO JLT |
|     Plaintiff, | **ORDER TO DENY TRO AND PRELIMINARY INJUNCTION** |
|   vs. | (Docs. 21, 22.) |
| OPEN SOLUTIONS, INC., | |
|     Defendant. | |
|                                         / | |

**INTRODUCTION**

Plaintiff Mission Bank ("Bank") seeks to enjoin defendant Open Solutions, Inc.'s ("OSI's") denial of access to the Bank's archived imaging data and software for the data which OSI stores. OSI contends that the Bank is unable to establish irreparable harm and likelihood of success on the merits to support injunctive relief. This Court considered the Bank's ex parte application for a temporary restraining order ("TRO") and motion for preliminary injunction on the record and VACATES the January 3, 2012 hearing on the preliminary injunction motion, pursuant to Local Rule 230(g).[1] For the reasons discussed below, this Court DENIES Mission Bank a TRO and preliminary injunction.

---

[1] This Court sees no delay to rule on the preliminary injunction motion given the completeness of the record and as otherwise discussed below.

# BACKGROUND

## Item Processing Agreement

The bank is California chartered and provides banking services in Kern County. OSI provides to financial institutions technology services to archive and retrieve digital images of banking items, including checks, transfer instruments, and deposit slips. In his declaration, Bank President A.J. Antongiovanni ("Mr. Antongiovanni") states that "the role of technology service providers such as OSI is critical to the Bank's ongoing operations." OSI notes that raw data relating to check images is readable or viewable only with OSI's "proprietary software."

In March 2007, the Bank and OSI entered into a five-year Item Processing Agreement ("IPA") for OSI to provide the Bank software systems to archive and retrieve the Bank's imaging data. More precisely, the IPA obligates OSI to provide the Bank "item processing services," including "the general management of Client's [Bank's] item processing, operation of software systems developed by OSI and third parties, programming services, furnishing and operating computer equipment, providing information in various media forms, and item processing. The specific services provided are described in more detail in Exhibit A ("Schedule of Services")." The IPA states that on the IPA's termination, "all Services to be performed under this Agreement shall cease and Client [Bank] agrees to promptly cease all use of the OSI Software System, licensed products or documentation provided to Client by OSI."

The IPA's Exhibit A addresses online image retrieval and internet access and provides:

> During the course of each processing day, OSI will move images and corresponding MICR information to its archive. OSI personnel will build the indexes to allow for the client to view these images. The Client will have access to such images no later than 08:00 on the next business day. The Client will use Web Browser to view these images. OSI will work with the Client's IT department to insure connectivity. **The Client will have online access to images for seven (7) years.** This functionality will be made available to client for the Service Fees outlined in <u>Exhibit B.</u>
>
> The Client's Internet Provider must be able to interface with the OSI Image Software as per OSI specifications. Requests for check images are sent to the OSI Image Archive via a dedicated line from the Internet Banking site. The image(s) are passed back to the Internet Banking Site and sent to the customer. **The Client's customers can have access to images for (7) years.** (Bold added.)

The IPA's Exhibit B is a service fees schedule and includes fees for "Archived Images – On-Line for 7-years on-line access."

///

**Unaccepted Deconversion**

In November 2011, the Bank decided not to renew the IPA and provided such notice to OSI. OSI notes that soon after the notice, OSI told the Bank that the Bank could enter into a $160,000 agreement with OSI to deconvert the database maintained by OSI. In his declaration, OSI account manager Tim Wilkinson ("Mr. Wilkinson") explains that deconversion "involves the extraction of data from multiple sources, the compilation and organization of that data, and then the delivery of it in a coherent format using OSI's proprietary software."

On March 26, 2012, the Bank requested a count of its images which OSI archived. Mr. Wilkinson's March 26, 2012 email responded:

> As discussed last week, pricing to begin receiving your images via FTP on a go-forward basis is a flat $250 per month. Additionally, you will need to either license a copy of our ISCheck Archive application or have some other archive application (that is able to import images in an Fed ANSI x937 format) in order to view these images.
>
> I will provide you with a report of the total volume of images for the past 7 years, as should you decide not to renew with Open Solutions and deconvert, then per Regulatory Requirements you will need to acquire the past 7 years' worth of historical data.

On March 27, 2012, OSI reported that it held 13,708,130 images. OSI proposed a Deconversion and Termination Agreement ("proposed deconversion agreement") by which OSI would provide "certain Client information and/or data" for $162,474.67. Mr. Antongiovanni declares that "[t]his was the first time Mission Bank learned that OSI intended to charge Mission Bank in order for OSI to return Mission Bank's images."

The September 11, 2012 letter of OSI Senior Corporate Counsel Brendan Witherell ("Mr. Witherell") to Mr. Antongiovanni states:

> I also take exception to your statement that all information and images collected by Open Solutions under the Item Processing Agreement are owned by Mission Bank. Any such information and images have been captured and stored into our archive solution utilizing our intellectual property and proprietary software, and within our hardware environment. On this basis, I fail to understand your claim that Mission Bank owns these materials and ask that you provide me with the basis for your assertion.

The Bank notes that after OSI learned that the Bank would switch to another vendor for image processing, Mr. Witherell responded with his September 26, 2012 letter ("September 26 letter") that:

> . . . Open Solutions' obligation to provide you with any services under the Item

3

> Processing Agreement therefore terminates when the agreement expires on October 3, 2012. We are proceeding accordingly and ask that you do so as well.
>
> In your Item Processing Agreement, the **terms are silent on transition services and/or deconversion services**. In cases like this where the parties have not previously agreed on deconversion pricing, we revert back to our standard list price for such additional services. The deconversion proposal that we provided to you reflects this standard pricing. We make this pricing freely available to clients and would gladly have provided it to you at any point during the term of your agreement.

With the IPA's termination, the Bank claims to lack access to it online image archive, including six years of checks, transfer instruments, deposit slips, and statements. OSI notes that during the past year since the Bank decided to terminate the IPA, the Bank could have physically printed images of checks processed by OSI or negotiated a deconversion agreement with OSI.

The October 24, 2012 letter of OSI counsel Paul Chan ("Mr. Chan") addressed preservation of data and invited negotiation of OSI deconversion services:

> . . . OSI has agreed to preserve the data and other materials it created during the time that the IPA was in effect. OSI has already issued a litigation hold with respect to materials relating to the instant lawsuit, and has otherwise made all reasonable efforts to ensure that such material are preserved.
>
> . . .
>
> . . . OSI has agreed to provide the Bank with "access" to OSI's proprietary materials and data, provided that the parties enter into a mutual satisfactory contractual arrangement for the provision of this information, i.e., the Conversion Agreement.
>
> . . . [I]f the Bank would like to continue negotiating the terms of the Conversion Agreement, OSI's business representatives stand ready to do so. Please let us know if the Bank would like to do so.

**The Bank's Wire To OSI**

On November 7, 2012, the Bank wired to OSI $162,474.67, which is the amount noted in the proposed deconversion agreement. Mr. Antongiovanni's November 7, 2012 letter to Mr. Witherell seeks a return of the Bank's data "in generic format" in that the Bank "will perform a manual deconversion or have another company do this." Mr. Chan's November 8, 2012 letter responded:

> As it has made clear many times, Open Solutions is not obligated to provide, and will not provide, deconversion services to the Bank in the absence of a mutually agreeable and enforceable Deconversion Agreement. Given that your client [Bank] has already sued Open Solutions (without basis) and twice moved for temporary injunctive relief (both times unsuccessfully) based upon OSI's alleged failure to provide such deconversion services, Open Solutions is not willing to provide the services absent an agreement between the parties about terms. Open Solutions is holding the funds wired by your client. If a mutually acceptable Deconversion Agreement cannot be reached,

Open Solutions will promptly refund those funds to your client upon request.

The Bank does not want to contract for additional services with OSI and wired the money to the Bank for, using the Bank's words, "return of its property which OSI is wrongfully withholding" in that the "data belongs to the Bank and OSI refuses to return it."

In his declaration, OSI's Mr. Wilkinson responds to the notion that the imaging data may be easily returned to the Bank:

> The transactional information and data previously provided by the Bank to OSI during the time the parties' IPA was in effect was not, and is not, maintained in a stand-alone, independently accessible or transferable database, file or account. Rather, data previously provided by the Bank to OSI was "wrapped" with OSI's proprietary software and coded, embedded and integrated with data provided by OSI's numerous other bank customers on OSI's proprietary Software System. OSI cannot simply isolate and export the Bank's data from the OSI Software System without performing "deconversion" services, i.e., identifying, separating, and extracting each component of data unique to the Bank from data relating to OSI's other customers, and reassembling such data in a format that will be accessible to the Bank.

### **Mission Bank's Claims**

On October 11, 2012, Mission Bank filed its Verified Complaint ("complaint") to allege:

1. A (first) breach of contract claim that OSI breached the IPA by "unilaterally increasing the price for Image Export/Import by a factor of ten" and demanding $162,474.67;

2. A (second) anticipatory repudiation of contract claim that the September 26 letter and OSI's actions "constitute anticipatory repudiation of the agreed terms of the IPA";

3. A (third) breach of implied covenant of good faith and fair dealing claim that OSI in bad faith seeks to impose an unreasonable fee to deconvert the Bank's images and refuses to return the Bank's images until OSI pays a deconversion fee;

4. A (fourth) replevin claim that OSI refuses to return the Bank's imaging data and has "wrongfully misappropriated" Bank property;

5. A (fifth) injunctive relief claim to grant the Bank "unfettered access to the archive"; and

6. A (sixth) declaratory relief claim for "judicial determination of the parties' rights and duties in and to the contract."

This Court's October 16 and 31, 2012 orders denied the Bank's ex parte TRO requests in that the Bank failed to demonstrate immediate or irreparable harm. The October 31, 2012 order states: "The

record reflects that the imaging data remains available to the Bank – at a cost. There is no indication that the Bank is unable to pay the cost. The Bank simply protests the cost which OSI attempts to negotiate. The Bank's remedy is not equitable relief. The Bank's remedy is to pay for the imaging data and to sue to recover the money its claims it is owed. The Bank's alleged injury is compensable in monetary damages."

On November 21, 2012, the Bank filed an answer to OSI's counterclaim and included a counterclaim against OSI to allege:

1. A (first) concealment counterclaim that the Bank was unaware of the hidden deconversion fee and OSI deceived the Bank "by intentionally leaving this material fact out of the contract negotiations so that the Bank would enter the IPA";

2. A (second) conversion counterclaim that OSI interfered with the Bank's property by preventing Bank access to and refusing to return "the Bank's confidential information without payment of an arbitrary 'deconversion' fee"; and

3. A (third) civil RICO[2] claim that OSI engaged in a scheme to defraud the Bank and other financial institutions by obtaining customer check image data and extorting "a huge payment for 'deconversion services' before relinquishing said property back."

Also on November 21, 2012, the Bank filed its third ex parte TRO request and its first motion for a preliminary injunction to preclude OSI to refuse the "Bank's access or the Bank's inquiry requests to OSI requiring research and access to its archived imaging data" and to refuse to turn over "the archived item images and data to the Bank together with any software required to read and search through the item images and data."

## DISCUSSION

### Injunctive Relief Standards

F.R.Civ.P. 65(b) permits a TRO "only if . . . specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." F.R.Civ.P. 65(b)'s requirements are "stringent," and

---

[2] RICO is the Racketeer and Corrupt Organizations Act, 18 U.S.C. § 1962.

temporary restraining orders that are granted ex parte are to be "restricted to serving their underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer." *Granny Goose Foods, Inc. v. Brotherhood of Teamsters*, 415 U.S. 423, 438-39, 94 S.Ct. 1113 (1974); *Reno Air Racing Ass'n v. McCord*, 452 F.3d 1126, 1131 (9th Cir. 2006).

F.R.Civ.P. 65(a) authorizes a court to "issue a preliminary injunction only on notice to the adverse party."

The Bank seeks a TRO and a preliminary injunction. Based on the record, this Court is prepared to rule on all of the Bank's requests for injunctive relief.

## **Injunctive Relief Requirements**

Injunctive relief is an "extraordinary remedy, never awarded as of right." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 24, 129 S.Ct. 365 (2008). As such, a court may grant such relief only "upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22, 129 S.Ct. 365. To prevail, the moving party must show: (1) a likelihood of success on the merits; (2) a likelihood that the moving party will suffer irreparable harm absent preliminary injunctive relief; (3) that the balance of equities tips in the moving party's favor; and (4) that preliminary injunctive relief is in the public interest. *Winter*, 555 U.S. at 22, 129 S.Ct. 365. In considering the four factors, the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24,129 S.Ct. at 376 (quoting *Amoco Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 542, 107 S.Ct. 1396 (1987)). A "preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S.Ct. 1865 (1997) (citation omitted).

## **Likelihood Of Success On Merits**

Pursuant to *Winter*, the Bank must make a "clear showing" that it is "likely to succeed on the merits." *Winter*, 555 U.S. at 22, 129 S.Ct. At 375-376; *Stormans, Inc. v. Selecky*, 571 F.3d 960, 978 (9th Cir. 2009).

The Bank argues that it will succeed on its conversion counterclaim.

"A conversion occurs where the defendant wrongfully exercises dominion over the property of another." *Bank of New York v. Fremont General Corp.*, 523 F.3d 902, 914 (9th Cir. 2008). "To establish

7

conversion, a plaintiff must show (1) his ownership of or right to possess the property at the time of the conversion, (2) that the defendant disposed of the plaintiff's property rights or converted the property by a wrongful act, and (3) damages. *Bank of New York*, 523 F.3d at 914 (citing *Messerall v. Fulwider*, 199 Cal.App.3d 1324, 245 Cal.Rptr. 548, 550 (1988).

The Bank argues that it never relinquished ownership of check images sent to OSI and that it "merely contracted with OSI to store the data to enable the Bank to search the data more quickly." The Bank contends that vendors other than OSI are able to manipulate the data "in generic form" to satisfy Bank needs. The Bank equates OSI's refusal to provide imaging data as "wrongful exercise of dominion over the Bank's property," especially given the Bank's $162,474.67 payment.

OSI responds that the Bank does not own the archived imaging data on OSI's proprietary software system and lacks current access to it given termination of the IPA and failure to agree to deconversion terms. OSI notes that the data provided by the Bank is embedded with OSI's proprietary software along with data of other OSI customers to render the data inseparable without deconversion.

The key property at issue is images of checks of Bank customers, who have rights at least as equal to the Bank in the images to diminish the Bank's ownership claims. Questions as to precise ownership of the property at issue cast doubt on the Bank's likelihood of success on its conversion and related claims, especially given that the imaging data is tethered to OSI's software system. Moreover, the Bank fails to substantiate ability to manipulate the imaging data in a generic form to distinguish its imaging data from that of other OSI customers.

The Bank further argues that it will succeed on its contract claims in that the IPA's Exhibit A references online access to images for seven years. However, the IPA and its Exhibit A contemplate such access based on Service Fees outlined in the IPA's Exhibit B. The online access requires payment of fees which the Bank appears unwilling to pay as evidenced by IPA termination and failure to accept or negotiate deconversion terms. The Bank fails to demonstrate likelihood of success on its contract related claims given that it terminated the contract upon which such claims are based and refused to enter into a further deconversion agreement. The Bank fails to challenge that the IPA is silent as to transition or deconversion services. However, nothing precludes the Bank from attempting to prove that OSI's proposed terms are unconscionable or onerous to invoke OSI's liability.

As to other claims, the Bank offers nothing meaningful to demonstrate a likelihood of success on its concealment and RICO claims.  The record suggests that the Bank contemplated a continuous contractual relationship with OSI or did not fully appreciate the effects to terminate the IPA.

### **Irreparable Harm**

"Preliminary injunctive relief is available only if plaintiffs 'demonstrate that irreparable injury is *likely* in the absence of an injunction.'" *Johnson v. Couturier*, 572 F.3d 1067, 1081 (9th Cir. 2009) (quoting *Winter*, 129 S.Ct. At 375) (noting that the Supreme Court in *Winter* rejected the Ninth Circuit's "possibility of irreparable harm" test).  "[T]o demonstrate irreparable harm the plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial. The preliminary injunction must be the only way of protecting the plaintiff from harm." *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91 (3rd Cir.1992); *see e.g., Weinberger v. Romero–Barcelo*, 456 U.S. 305, 102 S.Ct. 1798 (1982).  "[I]ntangible injuries, such as damage to . . . goodwill qualify as irreparable harm." *Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1001).

The Bank argues that it "is in imminent danger of suffering great and irreparable harm" in the form of "reputational injury and loss of goodwill."  The Bank claims that if it is unable to service customers and inquiries of law enforcement and taxing authorities, "there is a high likelihood that the Bank will be exposed to negative regulatory reports, criminal penalties and financial fines."  The Bank notes that it is subject to an Internal Revenue Service ("IRS") summons and Federal Bureau of Investigation ("FBI") request for check images for which the Bank "has no legitimate way to service these federal requests."

Mr. Antongiovanni declares:

> The number of customers who are affected and ultimately leave the Bank cannot be reasonably estimated.  The multiplicity of legal actions these customers may file against the Bank for failure to comply with its obligations to its customers cannot be estimated.  The reputational loss to the Bank for its inability to provide proper customer service cannot be reasonably calculated.  The number of administrative actions and regulatory inquiries the Bank will have to respond to from federal and state authorities cannot be estimated.  And it is simply impossible to know the harm that may flow from the Bank's inability to comply with its obligations under the USA Patriot Act and similar regulations.

OSI responds that the Bank's purported harm is of the Bank's making in that "the information

the Bank seeks is readily available subject only to the need for an agreement with basic terms to protect both parties." OSI points to the Bank's failure to productively negotiate meaningful deconversion services and the absence of "incident" since the Bank's original October 16, 2012 TRO attempt. OSI concludes that the need to negotiate deconversion terms does not equate to irreparable harm.

The Bank points to at most speculative harm. There is no evidence that Bank customers have threatened to leave or sue the Bank because of the parties' dispute. There is no evidence that the IRS or FBI has threatened action against the Bank. OSI notes that if the Bank cannot respond to requests or inquiries from the IRS, FBI or other authorities, the Bank can direct such requests or inquiries to OSI for response. Mr. Antongiovanni's declaration highlights speculation with its acknowledged inability to estimate customer dissatisfaction and the Bank's reputational loss and harm from purported inability to comply with authorities. The Bank fails to satisfy likelihood of irreparable harm.

That said, the above analysis would change if the Bank were subject to a legitimate customer threat to leave or sue the Bank because of inability to access imaging data or if the Bank were subject to legitimate civil or criminal investigation or penalty by the IRS, FBI or other authority. Moreover, the irreparable harm analysis could change with proof of legitimate loss to the Bank's reputation arising from the parties' dispute. Had the Bank demonstrated irreparable harm, this Court would be inclined to grant injunctive relief.

**Pecuniary Relief**

The Bank argues that pecuniary compensation is inadequate relief given it potential "irreparable reputational injury" and absence of a "fair, legal recourse to obtain its data from OSI." The Bank claims that the "return of its data," not monetary damages will make it whole.

For injunctive relief, "[i]t is usually enough if the plaintiff shows that its legal remedies are inadequate." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 18 (1st Cir.1996); *see Weinberger*, 456 U.S. at 312, 102 S.Ct. at 1803. "If the plaintiff suffers a substantial injury that is not accurately measurable or adequately compensable by money damages, irreparable harm is a natural sequel." *Ross-Simons*, 102 F.3d at 18. "Inadequate remedy at law does not mean wholly ineffectual; rather, the remedy must be seriously deficient as compared to the harm suffered." *Foodcomm Intern. v. Barry*, 328 F.3d 300, 304 (7th 2003).

"Typically, monetary harm does not constitute irreparable harm." *Cal Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 851 (9th Cir. 2009). "Economic damages are not traditionally considered irreparable because the injury *can later be remedied by a damage award*." *Cal Pharmacists,* 563 F.3d at 852 (italics in original).

This Court remains unconvinced that monetary relief is insufficient if the Bank establishes its claims. The gist of this dispute is that the Bank dislikes OSI's deconversion terms and pricing. The Bank has demonstrated its ability to pay OSI's $162,474.67 asking price. If such a price is unlawful or unconscionable, the Bank is free to attempt to prove as much along with corresponding damages. Contrary to the Bank's assertion, this Court never suggested that the Bank pay OSI $162,474.67. This Court has merely indicated, as it does again here, that the Bank fails to demonstrate that monetary damages are insufficient. However, if irreparable harm arises to the point that pecuniary relief is insufficient, injunctive relief may be proper.

### Balance Of Hardships And Public Interest

The parties' papers demonstrate that the likelihood of success and irreparable harm requirements are key. The Bank's points as to balance of hardships and public interest fail to outweigh its inability to demonstrate likelihood of success and irreparable harm.

### Delay To Seek Injunctive Relief

OSI faults the Bank's delay to seek a renewed TRO. OSI points to this Court's Local Rule 231(b), which provides:

> In considering a motion for a temporary restraining order, the Court will consider whether the applicant could have sought relief by motion for preliminary injunction at an earlier date without the necessity for seeking last-minute relief by a motion for temporary restraining order. Should the Court find that the applicant unduly delayed in seeking injunctive relief, the Court may conclude that the delay constitutes laches or contradicts the applicant's allegations of irreparable injury and may deny the motion solely on either ground.

OSI notes the parties' year-long dispute over deconversion services to have permitted the Bank to sooner seek injunctive relief and to have taken steps to retain imaging data prior to IPA termination.

This Court agrees with OSI that the record reveals no justification for the Bank's delay to seek requested injunctive relief.

///

**CONCLUSION AND ORDER**

This Court surmises that the Bank decided to terminate the IPA because it found another vendor which could provide services which the Bank found more appealing. However, the Bank apparently failed to contemplate or fully appreciate the intricacies of the software and related services provided by OSI and effects of IPA termination. The record reflects that OSI seized upon the Bank's predicament given the IPA's silence on transition and deconversion terms. This Court infers that OSI attempts to coerce the Bank's agreement for future services and to no less obtain the Bank's liability waivers.

The result of the parties' negotiations and non-negotiation is to embroil this Court in their dispute. As such, this Court encourages the parties to participate in a near future settlement conference before U.S. Magistrate Judge Jennifer Thurston. The parties may contact staff attorney Gary Green at (559) 499-5683 or ggreen@caed.uscourts.gov to initiate a settlement conference.

For the reasons discussed above and based on the current state of the record, this Court DENIES the Bank a TRO and preliminary injunction.

IT IS SO ORDERED.

**Dated:   December 6, 2012**              /s/ Lawrence J. O'Neill
                                           UNITED STATES DISTRICT JUDGE